UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARK R.,[1]

                                    Plaintiff                          DECISION and
                                                                       ORDER
-vs-
                                                                       1:21-CV-00080 CJS
COMMISSIONER OF SOCIAL
SECURITY,
                                    Defendant.
_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or

"Defendant") which denied the application of Plaintiff for Social Security Disability

Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits.

Now before the Court is Plaintiff's motion (ECF No.15) for judgment on the

pleadings and Defendant's cross-motion (ECF No. 19) for the same relief.   For

the reasons discussed below, Plaintiff's application is denied, and Defendant's

application is granted.

_____

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that,
"[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-
government party will be identified and referenced solely by first name and last initial."

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[3]

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[3] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.  In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the

disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage

4

in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action, which are set forth in the parties' papers.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

The medical evidence generally indicates that leading up to the alleged disability onset date Plaintiff had diabetes that was uncontrolled for approximately ten years,[4] with some degree of resulting neuropathy in his feet.[5]   In or about May 2018, Plaintiff sought treatment for "Charcot's joint" or "neuropathic arthropathy," a type of joint deterioration, in his left foot.[6] On May 18, 2018, treating podiatrist

---

[4] As late as September 2019 Plaintiff's doctor described plaintiff's diabetes as "uncontrolled," Tr. 688.   The Court's overall impression from Plaintiff's medical treatment records is that he was frequently noncompliant with his doctors' recommendations. *See, e.g.*, Tr. 638 ("The patient has had a long-standing history of noncompliance."); *see also, id.* at 602 (Plaintiff declined various offered exams and treatments); id. at 587 ("The patient states that he doesn't take his diabetes medication faithfully.   . . .   The patient absolutely refuses to allow me to start him on insulin today.").   Plaintiff has offered various reasons for such noncompliance, including loss of health insurance coverage. Tr. 460 (not taking diabetic medication due to losing insurance); s*ee, also,* Tr. 617 ("The patient was offered a referral to an endocrinologist or diabetic educator and he refuses both this time due to financial restraints."); *but see, id.* at Tr. 609 ("[R]efuses to see an endocrinologist because there is no[ne] within [one] hour of here.").

[5] Tr. 696.   Plaintiff was also obese and had hypertension.

[6] *See*, https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes/art-20049314

Robert Gilfert, DPM ("Gilfert") took x-rays of the foot and diagnosed Plaintiff as a "Type II diabetic with Neurotrophic Charcot foot, left, to include fracture of the calcaneus and navicular." (Tr. 377).   Gilfert fitted Plaintiff with a foot brace, noting, "He was advised to minimize his walking as much as possible.   He could go so far as to get a knee scooter or use crutches." (Tr. 376).

A month later, on June 12, 2018, Gilfert reported that "a lot of the swelling [was] down" and that Plaintiff had "walked a bit" using the brace. (Tr. 375).   Gilfert proposed to put Plaintiff's foot in a cast to allow healing. (Tr. 375) ("The plan is to put him in a fiberglass cast for more consistent immobilization and see if it will stabilize and quiet down and become pain free.   Alternatively, he may require a surgical fusion.").   Regarding Plaintiff's ability to return to his usual work as a forklift operator,[7]  Gilfert stated that the prognosis was unclear at that time:

> [Patient] inquires about his ability to work long-term.   Going forward in a stand up job.   It seems unclear at present time but certainly with his type of problem it is questionable whether he will be able [to] take it from a pain standpoint, whether the foot will be able to take it, or whether it will be at risk for ulceration and breakdown.

(Tr. 375).

---

("Charcot (shahr-KOH) joint, also called neuropathic arthropathy, occurs when a joint deteriorates because of nerve damage — a common complication of diabetes. Charcot joint primarily affects the feet.   What are the symptoms? You might have numbness and tingling or loss of sensation in the affected joints. They may become warm, red and swollen and become unstable or deformed."). Plaintiff's condition involved a bulge on the side of the foot (not the sole). *See*, Tr. 453 ("No open wound or rocker sole noted.   Significant bony prominence noted on the medial aspect of the midfoot, around the navicular region.").

[7]  Tr. 248 (Plaintiff reportedly worked as a forklift operator from August 2010 through May 2018).

On August 20, 2018, orthopedic resident Wajeeh Bakhsh, M.D. ("Bakhsh") reported that the swelling had "greatly improved" and that Plaintiff could stand and ambulate without a significantly antalgic (abnormal) gait. (Tr. 478, 480).

In or about September 2018, orthopedic surgeon Irvin Oh, M.D. ("Dr. Oh") recommended treating the left-foot condition by surgically fusing the affected joint, but the procedure was not performed because at that time Plaintiff's uncontrolled diabetes created too great of a risk for post-surgical infection.   Subsequently, Plaintiff continued to decline the surgery despite gaining better control of his blood sugar.

On November 28, 2018, Dr. Oh reported: "[Patient] [s]tates that the left foot/ankle intermittently swells after being on it for a while.   Has no complaint of pain today." (Tr. 538).   On January 28, 2019, and April 29, 2019, Dr. Oh reported that Plaintiff had no pain or swelling in the foot, except for intermittent pain when "[a]ggravated by a prolonged standing/ambulation or strenuous physical activity." (Tr. 562, 649).

In or about May, 2019, Plaintiff also sustained a diabetes-related "accessory navicular" avulsion injury to his right foot.   Despite that, on June 10, 2019, Dr. Oh noted that Plaintiff had a normal gait and could bear weight on the right foot. (Tr. 659).

On August 1, 2019, Plaintiff's primary care physician advised him to "continue to walk as tolerated" and "be active as possible." (Tr. 635).

On August 7, 2019, Plaintiff reported to Dr. Oh that he had no right foot pain, had resumed using a "regular working boot," and had "improved swelling and pain" generally, though with "intermittent painful swelling associated with prolonged standing/ambulation." (Tr. 666).   Dr. Oh noted that Plaintiff could bear weight on the right foot and had no pain with "resistive PF-Inversion motion." (Tr. 665).

Dr. Oh had intended to wait to perform surgery on the right foot until Plaintiff's diabetes was better controlled, but in the meantime Plaintiff engaged in "a lot of long distance walking" while on vacation which resulted in an infection that required immediate surgery.[8]   Consequently, on September 5, 2019, Dr. Oh surgically removed the infected avulsed bone/tendon particle.   One month after that successful surgery, Plaintiff reportedly told Dr. Oh that he had "no pain" in the right foot and was "ambulating in regular shoe intermittently." (Tr. 677).

In the administrative proceedings before the Commissioner, Plaintiff, a male in his late forties, claimed to have become disabled as of May 11, 2018, due to "diabetes" and "crushed foot." (Tr. 223).   Plaintiff claimed that he was disabled from working primarily because his foot problems prevented him from standing or walking for any length of time and required him to keep his feet elevated all day.

---

[8] Tr. 670, 673.   In connection with his disability claim Plaintiff has alleged that his right foot injury occurred after he walked only "60 feet."   Previously, though, Plaintiff reportedly told Dr. Oh that the injury occurred as a result of "a lot of long distance walking" while on vacation. *See*, Dr. Oh's treatment note, Tr. 673 ("[Following the accessory navicular avulsion], [w]e were planning on proceeding with right foot reconstruction (PT transfer) once the [diabetes] is better controlled. However, as he returned to wearing regular shoes and most recent trip to Kentucky where he did a lot of long distance walking, he returned to the office with a recurrent open wound on the medial side of the foot with drainage."); *see also*, Tr. 669 ("He was not compliant with using DM walking boot and went to Kentucky where he ambulated "more than he should have" on his regular working boot.").

(Tr. 338).

On November 8, 2018, internist Russell Lee, M.D. ("Lee") performed a consultative internal medicine examination of Plaintiff at the Commissioner's request, and later issued a four-page report detailing that examination. (Tr. 448–451).   Plaintiff reportedly told Lee that his daily activities involved simple food preparation about twice a week, shopping about twice per month, no household cleaning, and "childcare responsibilities daily." (Tr. 449). [9]   Upon examining Plaintiff, Lee reported that Plaintiff walked with a limp, was unable to walk on heels or toes, and wore a prescribed "protective boot" on his left foot.   Lee indicated, however, that Plaintiff could perform a "1/2 squat," was able to rise from his chair without difficulty, and needed no assistance getting on or off the examination table. (Tr. 449).   Lee observed "a deformity of the left foot with a bulge medially in the midfoot," referring to the Charcot's joint. (Tr. 451).   Lee's overall impression was that Plaintiff had "a moderate to severe limitation for activities involving prolonged standing, walking great distances, and climbing stairs," along with a "moderate limitation for activities involving bending and squatting." (Tr. 451).

On or about March 21, 2020, Plaintiff's attorney asked Dr. Oh to complete a functional capacity assessment form for the period "5/11/2018 to present." (Tr. 707).   The form asked Dr. Oh to describe Plaintiff's "ability to do work-related physical activities sustained throughout a regular work schedule (8 hours per day, 5 days per week, on a continuing basis)." (Tr. 703).   Dr. Oh indicated, in pertinent

---

[9]  Plaintiff was evidently referring to caring for his grandchild. (Tr. 21).

part, that Plaintiff could frequently lift and carry up to fifty pounds; stand and/or walk for four hours per day; and sit without limitation. (Tr. 703).   In a narrative section for "other comments," Dr. Oh added, "Should limit standing/ambulation to 4 hrs/8 hr shift due to diabetic Charcot neuropathy of the left foot and diabetic right foot." (Tr. 703).

On September 27, 2019, after Plaintiff's claim was denied initially, an ALJ conducted a hearing, at which Plaintiff appeared with an attorney.   The ALJ took testimony from Plaintiff and a vocational expert.

On March 31, 2020, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the SSDI and SSI application dates and the date of the decision. Tr. 16-28.   The ALJ applied the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments including diabetes, left foot Charcot neuropathy, "right foot avulsion fix," and obesity.   The ALJ also found that none of Plaintiff's severe impairments met or medically-equaled a listed impairment, and particularly that Plaintiff's foot problems did not meet or medically equal Listing 1.02 for major dysfunction of a joint.   Prior to reaching the fourth step of the sequential evaluation, the ALJ found that Plaintiff had the RFC to perform less than a full range of sedentary work.   In explaining his RFC finding, the ALJ indicated that he found Plaintiff's subjective complaints to be "inconsistent with the medical record in general." (Tr. 21).   At the fourth step, the ALJ found that with such RFC Plaintiff could not perform any past relevant work.   Finally, the ALJ found, at the fifth step of the sequential evaluation, that Plaintiff could perform four

different jobs identified by the VE as being jobs that could be performed by a hypothetical claimant with the Plaintiff's age, education and work experience and with the limitations contained in the RFC finding.   Consequently, the ALJ found that Plaintiff was not disabled.[10]

Plaintiff subsequently commenced the instant action, alleging that the Commissioner's decision must be reversed since it contains errors of law and is unsupported by substantial evidence.   As discussed more fully below, Plaintiff makes the following arguments: 1) the ALJ erred by failing to consider whether Plaintiff was entitled to a closed period of disability from May 2018 through the end of 2019; 2) the ALJ erred by failing to consider two medical opinions; and 3) the ALJ erred by failing to find that Plaintiff's condition met or medically equaled Listing 1.02, "Major Dysfunction of a Joint."

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

_The ALJ's Alleged Failure to Consider a Closed Period of Disability_

At the administrative level Plaintiff, who at all relevant times was represented by counsel, never argued that he was entitled to a closed period of disability.   Nor, more generally, did Plaintiff argue that his condition had improved

---

[10]  Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision, making the ALJ's ruling the Commissioner's final decision.

over time.   Rather, Plaintiff maintained that he was disabled throughout the entire period from the alleged disability onset date through the date of the hearing.

In this action, however, Plaintiff now maintains that the ALJ erred by failing to consider a closed period of disability, purportedly since his condition improved significantly after 2019.[11]   More specifically, Plaintiff contends that he was disabled between May 2018 and December 2019, due to the combination of his left- and right-foot injuries and his uncontrolled diabetes.   Plaintiff indicates that beginning in 2020, his condition significantly improved as a result of two events: The successful surgery on his right foot, in September 2019, and the reduction of his blood sugar level.[12]   Plaintiff maintains that this change in circumstances triggered a duty by the ALJ to specifically consider whether a closed period of disability benefits was appropriate.

Plaintiff admits that the argument is being raised for the first time in this action, but nevertheless maintains that the Court can consider it, citing *Verdi v. Commissioner*, No. 2:10-CV-135, 2011 WL 1361559 (D.Vt. Apr. 11, 2011). Defendant maintains that Plaintiff's arguments on this point lack merit.

---

[11]   *See*, Pl.'s Mem. of Law, ECF No. 15-1 at p. 19 ("By the end of 2019, however, Plaintiff reported improved pain and selling, he admitted to ambulating in a regular shoe intermittently, his wound was completely healed, he was able to actively invert the right foot without provocation of pain, and his A1c level decreased to 7.1 percent after medication adjustments by his treating endocrinologist.   The evidence shows that there was a marked improvement in Plaintiff's condition by the end of 2019.").
[12]   Despite this alleged significant improvement in Plaintiff's diabetes condition, it does not appear that he has ever had the fusion surgery on his left foot that was shelved in 2018 due to his previously-uncontrolled blood sugar level.

Plaintiff is correct that in certain instances an ALJ is expected to consider a closed period of disability benefits.

> "A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." *Pettaway v. Colvin*, 12-CV-2914 (NGG), 2014 WL 2526617 at *13 (E.D.N.Y. June 4, 2014) (quotation omitted). When deciding a disability claim, "if a claimant is disabled at any point in time, the ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period of not less than 12 months, following the date of [her] claim." *Williams v. Colvin*, No. 15-CV-144S, 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016). "It is particularly necessary for the ALJ to consider whether a closed period of disability existed where the record shows that plaintiff's condition has improved significantly over time as the result of a discrete event, such as surgery." *Robertson v. Berryhill*, No. 6:16-CV-06481 (MAT), 2017 WL 3574626, at *2 (W.D.N.Y. Aug. 18, 2017).

*Sandra Lee M. v. Comm'r of Soc. Sec.*, 541 F. Supp. 3d 277, 283 (W.D.N.Y. 2021) (Wolford, J.).

Here, however, the Court agrees with Defendant that Plaintiff's "closed-period argument" lacks merit.   While the ALJ did not expressly refer to a closed period of disability, he set forth the relevant standard, *i.e.*, that "in order to be entitled to *a period of disability*," a claimant must show "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for *a continuous period of not less than 12 months*," and then clearly indicated that he was finding that Plaintiff

was not disabled at *any time* during the relevant period, and thus that Plaintiff was not entitled to a closed period. That determination is supported by substantial evidence, including the opinions of Dr. Lee and Dr. Oh.

For example, treating surgeon Dr. Oh asserted that Plaintiff was capable of standing and/or walking up to four hours in an 8-hour workday throughout the closed period during which Plaintiff claims he was disabled due to being unable to stand and/or walk sufficiently to perform sedentary work. (Tr. 703).

Plaintiff, though, contends that the ALJ should not have relied on Dr. Oh's report, since the doctor's statement, in the "other comments" section of the report, that Plaintiff "should limit standing/ambulation to 4 hrs / 8 hr shift" is expressed in the present tense.   However, the ALJ was entitled to rely on the report, which expressly indicates that Oh's opinion concerned Plaintiff's ability to stand and/or walk during the period "5/11/208 to present." (Tr. 703).   Notably, in that regard, Dr. Oh indicated that Plaintiff was capable of standing and/or walking up to four hours in and 8-hr shift even with his left Charcot foot (his most severe and potentially-disabling problem),[13] the symptoms of which remained consistent throughout the relevant period.[14]

Moreover, Oh's opinion concerning Plaintiff's ability to stand and/or walk is not inconsistent with his treatment notes, which repeatedly indicated that Plaintiff was able to stand and ambulate despite the problems with his feet, and that Plaintiff

---

[13] Indeed, Plaintiff also contends in this action that his left-foot Charcot foot meets Listing 1.02.
[14] In this action, Plaintiff alleges that his right foot and diabetes improved after 2019, but he does not claim that his left foot improved, nor did he ever opt for surgery on the left foot.

generally experienced pain and swelling only after *prolonged* standing/ambulation.[15]

Plaintiff, though, contends that the ALJ should not have relied on Dr. Oh's opinion since it conflicts with one of his treatment notes in which he indicated that Plaintiff should limit weightbearing to his heel only. (Tr. 479) ("Limit WB to heel only"). However, that instruction was actually written by a resident, Dr. Bakhsh, not Dr. Oh, although Oh later signed off on Bakhsh's treatment plan. (Tr. 477). More importantly, it appears that instruction was not intended as a statement of Plaintiff's ability to stand and/or walk in general, but, rather, was given in anticipation of Plaintiff having fusion surgery on the left foot within a few days thereafter, presumably to avoid doing any further damage to the foot prior to surgery. However, Plaintiff never had the surgery, as discussed earlier, he resumed walking and standing using a brace. In sum, to the extent Plaintiff was limited to bearing weight only on his heel, the limitation was short-lived and did not require the ALJ to reject Dr. Oh's functional assessment.

Plaintiff further argues that the evidence of record "supports a finding that [he] was unable to work at even the sedentary exertional level for the approximately 19 months from May 2018 to December 2019." (Tr. 21). The question, though, is not whether such evidence could support such a finding, but

---

[15] Dr. Lee similarly indicated that Plaintiff would have a "moderate to severe limitation for activities involving *prolonged* standing, walking *great distances*, and climbing stairs." (Tr. 451) (emphasis added). Incidentally, the VE testified that the jobs that she identified as being able to be performed by someone with Plaintiff's RFC could all be performed predominantly while sitting. (Tr. 61).

rather, whether the ALJ's contrary decision is supported by substantial evidence. The Court finds that it is, and declines Plaintiff's invitation to re-weigh the evidence.

Lastly, to the extent Plaintiff is asserting that the ALJ committed legal error by failing to at least expressly discuss a closed period of disability, the Court again disagrees.   In that regard, Plaintiff now claims that the ALJ's duty to discuss a closed period arose because his condition clearly and significantly improved after 2019.   However, even assuming *arguendo* that an ALJ has such a duty where a claimant's condition improves significantly, Plaintiff's belated claim of improvement is contrary to the position he took at the hearing, on March 10, 2020, long after the supposed improvements had occurred.   For example, Plaintiff told the ALJ that both of his feet still hurt after he was on them "for *any* period of time." (Tr. 43) (emphasis added).   Additionally, Plaintiff told the ALJ that he has pain in both feet "every day," and "pretty much all day," even though that assertion is inconsistent with the treatment notes, which frequently reported that Plaintiff generally denied having pain. (Tr. 51).[16]   Plaintiff also testified, contrary to Dr. Oh's notes, that his right foot was still not properly healed from the surgery. (Tr. 47).   Although, when pressed on that point by the ALJ, Plaintiff admitted that "the surgery was successful and now it's healed." (Tr. 47).   Nevertheless, Plaintiff further testified that he needed to keep both of his feet elevated in a recliner chair at least six hours per

---

[16]  Plaintiff further testified at the hearing that his feet swelled not only after standing and/or walking, *but after sitting upright* for 20 minutes (Tr. 53), though no doctor in this action indicated that prolonged sitting in a normal position would cause Plaintiff's feet to swell.   Indeed, treating surgeon Dr. Oh stated that Plaintiff could sit "without limitation" despite the problems with his feet. (Tr. 703).

day. (Tr. 54).   Plaintiff also told the ALJ that his diabetes was still not properly controlled, which was why he still had not had surgery on his left foot after two years. (Tr. 46, 48).   Consequently, Plaintiff's contention that the ALJ should have considered a closed period because his right foot and diabetes vastly improved after 2019 is contrary to his own hearing testimony.   Under these circumstances, the Court declines to find that the ALJ had a duty to discuss a closed period of disability.

<u>The ALJ's Alleged Failure to Evaluate Two Medical Opinions</u>

Plaintiff next alleges that the ALJ committed legal error by failing to evaluate two medical opinions concerning Plaintiff's left foot, namely, the statement by Dr. Gilfert that Plaintiff should minimize his walking and possibly use a knee scooter or crutches, and the statement by Dr. Bakhsh/Dr. Oh that Plaintiff should limit weight bearing to his heel.   As discussed earlier, Dr. Gilfert's statement was an instruction to Plaintiff in May 2018, when Gilfert first began treating Plaintiff and was attempting to diagnose the problem, and the statement by Dr. Bashsk/Dr. Gilfert was an instruction to Plaintiff in August 2018, immediately prior to the expected surgery on Plaintiff's left foot, which ultimately never occurred.   Plaintiff contends that both statements were "medical opinions" within the meaning of 20 C.F.R. §§   404.1513(a)(2)(i) & 416.913(a)(2)(i),[17] and that the ALJ therefore had

---

[17] *See*, 20 C.F.R. § 404.1513(a)(2)(i) ("(2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (For claims filed (see § 404.614) before March 27, 2017, see § 404.1527(a) for the definition of medical opinion.) (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural

a duty to evaluate them pursuant to 20 C.F.R. § § 404.1520c & 416.920c and make findings concerning their supportability and consistency.[18]   Plaintiff contends that these "medical opinions" conflict with the RFC and that the ALJ was therefore required to explain why he did not adopt them.   Plaintiff maintains that the ALJ's failure in this regard requires remand.

Defendant maintains that this argument is baseless, since the two statements "do not express what Plaintiff could or could not do in a work setting" and therefore do not qualify as medical opinions.[19]   Alternatively, Defendant maintains that any failure to treat the statements as medical opinions was harmless, since neither statement indicated that Plaintiff was capable of less-than-sedentary work over a period of at least 12 months, or would otherwise have changed the ALJ's decision. *See, e.g.*, Def. Memo of Law (ECF No. 19-1) at p. 25 ("Dr. Oh's records show that the recommendation [that Plaintiff bear weight only on his heel] was not durational, i.e., did not span a period of at least 12 months.").

_____

functions, such as reaching, handling, stooping, or crouching)").

[18] *See*, 20 C.F.R. § 404.1520c ("When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.").

[19] ECF No. 19-1 at p. 23.   Defendant also points out that Plaintiff's argument on this point is curiously selective in what it characterizes as a medical opinion.   That is, the record contains various other statements of a similar nature by treating doctors, such as Plaintiff's primary care doctor's recommendation that Plaintiff "be active as possible" (Tr. 635), that Plaintiff does not claim are medical opinions.

The Court agrees that neither of the statements was a "medical opinion," and, alternatively, that any error by the ALJ in that regard was harmless.   Neither statement was intended to, or did, express any opinion about what Plaintiff could do or could not do on an ongoing basis despite his left foot injury.   Rather, both statements were in the nature of temporary instructions to Plaintiff to avoid certain activities, or to take certain steps to avoid further injury to the foot, while the doctors figured out how to treat the injury. *See, Finn v. Comm'r of Soc. Sec.*, No. 21 CIV. 5457 (SLC), 2022 WL 4245196, at *8 (S.D.N.Y. Sept. 15, 2022) ("As an initial matter, the Record does not appear to contain a medical source opinion from Dr. Omar, *i.e*., a statement about what Mr. Finn could "still do despite [his] impairment(s)[.]" 20 C.F.R. § 404.1513(a)(2).   Rather, Dr. Omar "advised" Mr. Finn to take several steps "to improve the functional capacity" including "[l]ow impact aerobic conditioning[,] [s]trengthening exercises[,] [w]alking[,] [i]ncreas[ing] daily activity as tolerated[,] [and] avoid[ing] sitting for longer period of time." (R. 545). *These prescriptive, rather than descriptive, statements do not qualify as medical opinion whose supportability and consistency the ALJ would have been required to assess.*") (emphasis added, citations omitted); *see also, Ayala v. Kijakazi*, No. 20-CV-09373 (RWL), 2022 WL 3211463, at *20 (S.D.N.Y. Aug. 9, 2022) ("Treatment notes are not ordinarily a substitute for a treating physician's opinion.   Furthermore, the ALJ did not explain why she would consider Dr. Rose's prescriptive treatment instructions to Ayala regarding what to avoid in his daily activities as a medical opinion to be discounted as unpersuasive.").   As such, the

19

statements did not reflect Plaintiff's overall functioning and were, in any event, clearly inconsistent with the rest of the medical record since Plaintiff indisputedly was not actually limited to walking only on his left heel or to using a knee scooter or crutches to ambulate.[20]

<u>The ALJ's Alleged Error at Step Three</u>

Lastly, Plaintiff contends that the ALJ erred in failing to find that his left-foot Charcot's condition qualified as a listed impairment under Listing 1.02, Major Dysfunction of a Joint.   As Plaintiff notes, the listing required that the joint dysfunction result in, *inter alia*, in the "inability to ambulate effectively."[21]   The ALJ found that the listing did not apply, in part since Plaintiff could ambulate effectively despite his impairments.[22]   Plaintiff insists that was error, since "Plaintiff's presentation taking a few steps in a doctor's office is inadequate evidence that he could ambulate effectively as defined by the regulations, which is the ability to 'sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."[23]   Plaintiff further notes that *he reported* "being able to walk no more than 50 feet before having to stop and rest for 15-20 minutes as

---

[20] For instance, Dr. Gilfert made that statement about the possible need for crutches or knee scooter immediately after diagnosing a "cuboid navicular fracture," for which he recommended immobilization and/or fusion surgery. (Tr. 377).   As it turned out, after a brief period of immobilization Plaintiff resumed walking on the left foot using a brace, without ever having surgery, and Dr. Oh opined that Plaintiff could stand and/or walk for four hours during an 8-hour workday even with the left Charcot foot. Moreover, even when Dr. Gilfert made the statement he indicated that it was at least possible that Plaintiff would, after treating the fracture, be able to return to his usual full-time work which was performed entirely while standing. (Tr. 375).
[21] Pl.''s Mem. of Law, ECF No. 15-1 at p. 24.
[22] *See*, Pl.'s Mem. of Law, ECF No. 15-1 at p. 25 ("The ALJ also found that there is no evidence of an inability to ambulate effectively, citing primarily to clinical findings from the consultative examination.").
[23] Pl.'s Mem. of Law, ECF No. 15-1 at p. 25 (citation omitted).

well as a significantly limited ability to stand."[24]   Plaintiff maintains, therefore, that the ALJ erred in finding that the listing did not apply.

However, the ALJ was not required to accept Plaintiff's testimony concerning his ability to ambulate where, as here, he found that Plaintiff's subjective complaints were "inconsistent with the medical record in general." (Tr. 21).   Moreover, that determination by the ALJ, as well as his determination that Plaintiff was still able to ambulate effectively despite his impairments, are supported by substantial evidence, despite Plaintiff's assertion that the ALJ should have weighed the evidence differently.   Consequently, Plaintiff's contention that the ALJ erred by failing to find him disabled under Listing 1.02 also lacks merit.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.15) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 19) for the same relief is granted.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        March 8, 2023

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

---

[24] Pl.'s Mem. of Law, ECF No. 15-1 at p. 25.